**UNITED STATES of America, Plaintiff,**

v.

**John DOE, Defendant.**

**No. 68 Cr. 436.**

United States District Court, S. D. New York.

June 2, 1971.

Whitney North Seymour, Jr., U. S. Atty., S.D.N.Y., New York City, for the United States; John R. Wing, Asst. U. S. Atty., of counsel.

Irving Anolik, New York City, for defendant.

## MEMORANDUM

COOPER, District Judge.

The defendant "is seeking a reduction of his sentence or possible placement on probation * * *" pursuant to Rule 35 of the F.R.Crim.P. Affidavit of his attorney Irving Anolik verified May 12, 1971.

After a jury trial from February 6 to 17, 1969, defendant was convicted on eight (8) counts charging him with bribery, conspiracy to bribe, aiding and abetting bribery by fellow Internal Revenue agents and failing to report violations of the internal revenue laws. After a careful review of the pre-sentence report prepared by our probation department, on March 31, 1969 we imposed a sentence of eighteen (18) months on each count, the sentences to run concurrently. We note that on four of the eight counts the maximum penalty on each is 5 years and/or $10,000; on each of the other four counts: 2 years and/or $10,000.

His conviction was affirmed by our Circuit Court on November 13, 1969; the Supreme Court denied certiorari on May 3, 1971. Defendant has been at liberty since the day of sentence.

The burden of this application is that the defendant's prison confinement now about to commence under sentence imposed more than two years ago should be vacated in its entirety or substantially reduced on the ground that the distress, fright and anguish he has suffered by reason of the conviction is sufficient "punishment" for the iniquitous behavior the jury found he engaged in; that mercy, compassion and understanding should be accorded him. For our part, and for reasons hereinafter indicated,

we have already demonstrated that the sentence imposed reflected considerable concern for defendant's rehabilitation by factors additional to confinement; otherwise the prison sentence would have been much more severe. We are fully and constantly aware that over-punishment is harmful to a defendant and the community alike; that the backlog of hatred and frustration cherished by many sentenced to prison is a factor in the growth of disrespect for law.

As to defendant's alternative application that he be placed on probation, we are compelled in all good conscience to deny it. We believe in probation, but we do not "hand it out." We prescribe it freely but only where indicated. It can be wrongfully used as a painkiller to mask symptoms and conditions. It is an inexcusable way of reducing a cluttered-up court calendar, or keeping down an overloaded jail population, of indulging personal pity. In some instances—we do not regard the case before us as one of them—probation is as cologne to gangrene.

We are fully aware that defendant has lost his important position of revenue agent with the Internal Revenue Service which he held for seventeen (17) years advancing to one of the highest grades in that post, the loss of his pension rights, the disgrace and obloquy of a felony conviction, along with good points in his favor. All this was before us at the time sentence was meted out; each of those factors entered into our deliberation then.

Defendant urges us to bear in mind the anguish that was constantly with him while awaiting the outcome of his appeals. Defendant's unsworn statement dated May 11, 1971. Certainly such steps were of his own free choice. Whatever may be the true cause of his distress in this regard (certainly contrition, for example, did not enter), we are convinced he did not take the matter lightly. Yet, we find it difficult to give the consideration defendant advances therefor.

Contrition? Hardly a trace. We are not impressed by the unsupported generalization of defendant's attorney that defendant "recognizes that what he did was wrong." Affidavit of Irving Anolik, supra, p. 2. While defendant begrudgingly admits to taking part in certain phases of the illegal acts for which he stands convicted (his wife adds: " * * * he did pay and [sic] undercover agent $150.00 for a pack of lies * * * " (her letter of May 11, 1971 to the Court)), at no time does he denounce even the admitted extent of his participation. In fact at the close of trial, defendant declared the jury verdict "completely unjustified" and that he had been "framed." At the same time, his wife, who with understandable concern daily attended the trial, regarded the jury "uneducated, lacking the ability to comprehend such a complicated case." Report of probation department.

We are unsure whether he attributes his arrest to luck, clumsiness, having been double-crossed, the failure of associates; whether he is ready to repudiate the potential value he saw in his offense as he planned it; whether he still believes that a theft not discovered or not punished scores high and is a solid advantage.

Defendant had every right before and after his conviction to refrain from assisting the Government in its efforts to bring to light and hold to account defendant's co-offenders in the Internal Revenue Service who participated with him in nefarious schemes. The fact remains, he did not. To the contrary, the Government complains that he hindered its efforts. Affidavit of Assistant United States Attorney Wing, verified May 21, 1971, pp. 2, 3.

We are implored to consider the sad effect of defendant's plight on his immediate family (wife, a son of 16, a daughter, 13). We do indeed. We regard it a surcharge on the judicial con-

science, wondering, as always, why a defendant—especially when as here he has high intelligence—disregards the disastrous results that invariably befall the family by his voluntary participation in basic infractions of law condemned by mankind over the centuries.

We put aside as childish the rhetorical question put by members of defendant's family: Why should he go to jail? "Did he kill someone? Rob a bank? Bomb a federal building? Is he a gangster?" This is yet another example of the generalized irresponsibility that at presently abounds on all sides; lament is confined to the misfortune of getting caught. A part of this general mood reflects the estimate put on a criminal conviction involving moral turpitude—it is either condemned or disregarded not on the ethic "It's wrong no matter who did it" but on the answer to "Whose side's he on?" And so we have come not to expect contrite behavior on the part of the offender and those about him; rather to find an incessant condemnation of the law's insistance that its prohibitions should not be brushed aside (so often with indifference).

\* \* \*

" \* \* \* he has also lost his license to practice as a Certified Public Accountant. This, of course, has caused him to suffer severe economic losses as well." This is error. Since this had not been mentioned in the pre-sentence report, we caused inquiry to be made; we are now reliably informed by the probation department that while the state licensing authority had been unaware heretofore of defendant's conviction, it now would initiate steps looking to the revocation of defendant's CPA license; that the license authority in any event would have withheld action pending the outcome on appeal.

It frequently happens that a public agency, which if alerted might take appropriate steps to reexamine a licensee's fitness longer to remain a member of an honorable profession, is not made aware of an offender's conviction after trial or by plea. No "clearing house" system exists to assure transmission of such information.

We are convinced defendant will lose his CPA license. This gives us pause. Defendant was born in 1927; educated at a "free" college and university (his last degree was a master's in business administration); throughout his scholarship was of a high order. We entertain the notion that in those years, words like "integrity" "honor" "responsibility" "self-respect" had for him much more than their hollow meaning evident by his illegal behavior over an extended period of time (we do not deal here with a single, spontaneous act) when he occupied a position of public trust.

Despite defendant's poor estimate of life's exemplary values, we have no doubt that the loss of his CPA license will prove a severe blow regardless of what may be the true cause of his regret. He labored long and hard to obtain recognition which came with the coveted license. No longer will he be a member of an honorable profession; lost to him will be its privileges and emoluments. This indeed in of itself is punishment.

While it may well be said that every member of a profession is fully aware that he endangers his license when he violates the law's prohibitions, the fact remains that when the loss actually occurs it is most severe; obviously it is not among the losses sustained by the vast majority of offenders. From our judicial experience we learn that the possible loss of professional standing rarely occurs to the offender; he thinks first of the penalty of imprisonment, of the criminal fingerprint; we observe that whatever may be his estimate of his professional license, its actual forfeiture invariably produces a crushing effect on him. We believe it will be so

here. This in main prompts our decision to reduce the period of incarceration from eighteen (18) months to one (1) year. The amended judgment and commitment shall so reflect.